[No. A076244. First Dist., Div. One. July 25, 1997.]

KPFF, INC., et al., Plaintiffs and Appellants, v.
CALIFORNIA UNION INSURANCE COMPANY, Defendant and
Respondent.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B., C., and D. of the Discussion.

**COUNSEL**

Christine A. Balthazar and Samuel F. Barnum for Plaintiffs and Appellants.

Larson & Burnham, Gary R. Selvin and Michael K. Johnson for Defendant and Respondent.

## OPINION

**SWAGER, J.**—This appeal arises from a dispute between two insurers concerning coverage of a claim against a structural engineering firm under a "claims-made" professional liability insurance policy. The insured, KPFF, Inc., and the insurer, Security Insurance Company of Hartford, which paid the disputed claim (hereafter appellants), brought an action against the firm's insurer for a prior year, California Union Insurance Company (hereafter California Union), which denied coverage of the claim. The trial court found for California Union and entered a judgment dismissing the complaint. We affirm.

### PROCEDURAL HISTORY

Almost five years after the complaint was filed in September 1989, the parties agreed to a trial before the court and waived the five-year limitation of Code of Civil Procedure section 583.310. The trial court ordered the trial bifurcated. The first phase was reserved for the issue of waiver and certain procedural issues and the second phase for the issue of insurance coverage under the "awareness provision" of California Union's insurance policy.

The issues reserved for the first phase came up for trial on November 14, 1994, and were submitted to the court, without the presentation of oral testimony, on the basis of documentary evidence, declarations and deposition evidence. The court found for California Union and directed the parties to exchange proposed stipulations of facts for trial of the coverage issue in the second phase of the proceeding. Although no material facts were in dispute, the parties were unable to agree on the relevance of certain evidence. At the second phase of the trial on August 17, 1995, they submitted the case to the court on the basis of separate statements of stipulated facts and separate submissions of trial exhibits, with evidentiary objections to the other's statements and exhibits. The court found again for California Union. Upon appellants' request, it filed a statement of decision on August 13, 1996, covering the issues decided in both phases of the proceeding. The judgment dismissing the complaint was entered the same day.

### FACTUAL BACKGROUND

The claim arises from construction of a Marriott Hotel in Portland, Oregon, between 1978 and 1980. The owner of the underlying real property,

Moran Construction Company, acted as the general contractor and retained W. P. Harlin Construction Company to construct the structural concrete frame. The project architect hired KPFF, Inc., as its structural engineering consultant with responsibility for structural design, plans, drawings and calculations. Construction of the hotel was completed and accepted in August 1980. Upon completion of construction, Moran sold the hotel to the construction lender, Equitable Life Assurance Society of the United States which leased it to Marriott Corporation.

The Marriott Hotel is a concrete shear wall building which, like all buildings, must withstand the vertical force of gravity and the lateral forces of wind and earthquakes. According to the undisputed engineering testimony, the floors and walls in this form of construction participate in both the vertical and lateral load-bearing systems. The vertical load-carrying system consists of concrete floors supported by walls and columns, and the lateral load-carrying system consists of floors and walls. The floors are an essential component of the lateral load-bearing system because they tie the shear walls together into a single unit with requisite structural integrity. The floor slabs in the building were reinforced by post-tension cables encased in plastic sheathes. Under this method of construction, the cables are strung from one side to the other of the slab form but are anchored only to one side. After the rebar is fully in place, the concrete is poured into the form and allowed to harden. The unattached ends of the cables are then pulled to an appropriate tension and anchored to the side of the floor slab.

California Union insured KPFF from December 15, 1982 to December 15, 1983, under a professional liability insurance policy with a $50,000 deductible. The insuring agreement limits coverage to claims "made against the Insured and reported to the Company during the Policy Period." The policy contained an "awareness provision" which provides: "If during the Policy Period, the Insured shall first become aware of any circumstances which may subsequently give rise to a Claim against the Insured by reason of any act, error or omission for which coverage is otherwise provided hereunder, and if the Insured shall during the Policy Period give written notice to the Company of such circumstances, any Claim which may subsequently be made against the Insured arising out of such act, error or omission shall be deemed for the purpose of this insurance to have been first made during the Policy Period."

Shortly before the policy period, Moran filed a complaint against Harlin in an Oregon court seeking damages in the amount of $25,100 for expenses it had incurred as the general contractor in repairing certain post-tension cables in the lower floors of the Marriott Hotel. Harlin in turn filed a third party complaint against KPFF and certain other parties.

The second amended complaint in the Moran action alleged that, since construction of the hotel was completed, "cracking of the concrete in certain of the floor slabs of the Hotel has occurred." Within one year after completion of Harlin's work, three post-tension cables or tendons failed in the G-2 slab of the hotel. There were three additional tendon failures between May 1981 and July 15, 1982. As general contractor, Moran was obliged to repair four cable failures, thereby incurring the $25,100 in damages alleged in the complaint.

Harlin's third party complaint, which incorporated by reference the second amended complaint, alleged that KPFF negligently designed the building "in that: [¶] (a) the engineering drawings and shop drawings showed the post-tensioning cables to be incorrectly located, [¶] (b) the floor slabs were designed such that excessive cracking of concrete would result." In addition, KPFF failed to exercise due care in field coordination of construction, "in that [¶] (a) there was insufficient protective grease or lubricant on the tendons, [¶] (b) there were breaks and tears in the protective sheathing surrounding the tendons, [¶] (c) there was rust, corrosion and pitting on the tendons, [¶] (d) the tendons were installed above or below the high and low points respectively called for in the specifications and floor slabs; and [¶] (e) moisture on the floor slabs was allowed to infiltrate the cracks and come in contact with and corrode the tendons."

KPFF tendered defense of the action to California Union. After receiving copies of the pleadings filed by Moran and Harlin, California Union accepted the defense and appointed the Portland law firm of Schwabe, Williamson, Wyatt, Moore & Roberts as legal counsel to represent KPFF.

On September 26, 1983, Daniel Knox, an attorney in the Schwabe firm, wrote a lengthy letter to California Union's claim manager recounting the depositions of several witnesses in the Moran litigation. Mr. Knox reported that the litigation had aroused considerable interest among all affected parties because there was reason to believe that Equitable, the current owner of the hotel, was preparing a much larger claim: "As I sat through these depositions . . . , I found myself wondering why it was that so many parties were involved in a case for a mere $25,000. The answer, I am afraid, was not long in coming. . . . We were advised by counsel for plaintiff [Moran] that Equitable has apparently spent over $100,000 in testing and investigation of the flooring slabs at the lobby level and the two levels immediately below the lobby. . . . Whether there is any substance to that report, I cannot say. . . . [T]he original complaint filed by Moran against W. P. Harlin included a demand for declaratory relief for any future defects found in the flooring at the Marriott Hotel. . . . I suspect, then, that this case was filed,

not so much to recover the $25,000 spent to repair the four cable failures, but to attempt to get a declaration as to responsibility for whatever defects may exist and which are apparently being investigated at the present time by Equitable. . . . I am convinced that this lawsuit was filed by Moran in an effort to get a determination as to which parties may be responsible for the slab problems at the Marriott, so that in the event the Equitable people file suit, Moran Construction would have a quick and simple recourse against those parties."

California Union's claims handler, James Morris, noted in a handwritten file memo dated October 20, 1983: "Defense counsel has heard rumors that plaintiff has another claim against defendants, including OI [our insured] which is much more serious. DC [defense counsel] will attempt to find out what error may be alleged." Mr. Morris did not receive any further information from defense counsel or any other source concerning the rumored claim.

Mr. Knox's suspicions proved to be prescient. In 1983, Neil Hawkins, a civil engineering professor at the University of Washington, was retained by Equitable "to analyze the significance of the cracked concrete slabs" in the lower floors of the Marriott Hotel "relative to the gravity load resisting system" of the building. In the course of his investigation, he became concerned "about the ability of the Marriott Hotel to withstand seismic forces because the cracked concrete slabs were tied to the Hotel's shear walls, such that there was an interrelationship between the concrete slab functions and the shear wall functions." In a report in the fall of 1983, he recommended that Equitable also conduct "a full investigation of the lateral load system" of the hotel.

In April 1984, Moran reached a settlement with KPFF and other third party defendants in which they agreed to pay Moran a total of $30,000. KPFF contributed $5,000 of this amount. In the settlement agreement, Moran reserved all rights it might have in the future against any party to the settlement agreement relating to the Marriott Hotel project.

On August 29, 1986, Equitable filed an action against Moran in the United States District Court for the District of Oregon seeking damages in the amount of $375,000 as the result of broken tendons and cracking in two levels of the parking garage. Moran filed a third party complaint against KPFF and various other parties, and California Union again accepted a tender of the defense. A year later, on September 1, 1987, Equitable's attorney sent a letter to all counsel advising that it intended to file "an additional claim against Moran and KPFF" relating to "the building's capability to withstand seismic shocks." In a motion for leave to file an amended

complaint stating a claim for damages for seismic defects, Equitable's attorney averred that, at the time the complaint was filed, Equitable had retained engineering firms who were then engaged in an investigation of seismic defects and that the engineering consultants had "finally determined that the building fails to meet code seismic requirements." On October 7, 1987, the United States District Court entered an order allowing Equitable to file the amended complaint adding KPFF as a defendant, which alleged that KPFF negligently "failed to properly design The Marriott Hotel shear walls in a manner that would ensure compliance with the seismic provision of the Uniform Building Code."

The seismic claim was asserted at a time when the parties were well advanced in settlement negotiations concerning the original claims. Around the time the amended complaint was filed in October 1987, the parties finally reached an agreement on the terms of a settlement of these claims. KPFF agreed to contribute $25,000 to the settlement under the deductible provision of the California Union policy. The settlement documents were executed in January 1988. California Union represented KPFF in the Equitable action until the nonseismic claims were settled and then formally denied coverage for the claim against KPFF for seismic deficiencies. KPFF then tendered the defense of the seismic claim to Security Insurance Company of Hartford, which insured it under a professional liability coverage policy, with a deductible of $100,000, during the period of January 16, 1987, to January 16, 1988. While accepting the defense under a reservation of rights, Security notified California Union that it would seek reimbursement of all funds it might pay to defend and indemnify KPFF.

Following California Union's withdrawal, KPFF paid attorney's fees and legal expenses in defense of the Equitable action in the amount of $95,265.45, a sum within the deductible provision of Security's policy. On December 28, 1988, the remaining parties to the Equitable action reached a settlement under which KPFF was obligated to pay $420,000. Pursuant to the deductible provision, KPFF paid $4,834.54 of this amount, and Security paid the balance. KPFF and Security subsequently filed the present action in the Superior Court of San Francisco. KPFF seeks damages for the $100,000 it paid under the deductible of the Security policy, plus attorney's fees and costs; Security seeks damages reimbursing it for all expenses incurred in the defense and settlement of the Equitable action.

DISCUSSION

A. *Awareness Provision*

In their principal assignment of error, appellants argue that the seismic claim was covered under the terms of the "awareness provision" of

the California Union's policy. Since a provision of this kind is used only in a claims-made policy, we begin with a consideration of the underlying terms of the insurance agreement.[1]

■ " 'Claims made' coverage arose more than 20 years ago, initially in the field of professional liability insurance, because underwriters were concerned that occurrence-based coverage was adversely affecting the underwriting process. Because the injury and negligence giving rise to a malpractice claim is often not discoverable until years after the negligent act or omission, professional liability insurance carriers, in an effort to reduce their exposure to an unpredictable and lengthy 'tail' of lawsuits, shifted to the 'claims made' policy." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 688-689, fn. 24 [42 Cal.Rptr.2d 324, 913 P.2d 878].) "The social utility of 'claims made' policies has been well documented. Underwriters, secure in the fact that claims will not arise under the subject policy after its expiration or termination can underwrite a risk and compute premiums with greater certainty. An insurance company can establish its reserves without having to consider the possibilities of inflation beyond the policy period, upward-spiralling jury awards, or later changes in the definition and application of negligence. [Citation.] There are benefits to the insured as well. Among other things, 'claims made' policies aid in making insurance more available and less expensive than 'occurrence' policies." (*Pacific Employers Ins. Co. v. Superior Court* (1990) 221 Cal.App.3d 1348, 1359-1360 [270 Cal.Rptr. 779], fn. omitted; *Homestead Ins. Co. v. American Empire Surplus Lines Ins. Co.* (1996) 44 Cal.App.4th 1297, 1304-1305 [52 Cal.Rptr.2d 268].)

Like many claims-made policies, the California Union policy specifically limits coverage to claims made against the insured *and* reported to the company during the policy period. "Such policies only cover claims reported to the insurer *during* the policy period. Timely reporting of the claim is thus the event *triggering coverage*; this condition is enforceable according to its terms." (Croskey et al., Cal. Practice Guide: Insurance Litigation 1 (The Rutter Group 1996) ¶ 3:170, p. 3-34.) In *Pacific Employers Ins. Co v. Superior Court, supra*, 221 Cal.App.3d 1348, the court noted that such policies " 'are essentially *reporting* policies' " (*id.* at pp. 1358-1359) and rejected an argument that they violated public policy. (*Id.* at pp. 1359-1360; see also *Industrial Indemnity v. Superior Court* (1990) 224 Cal.App.3d 828 [275 Cal.Rptr. 218].)

■ The awareness provision is clearly a coverage clause which extends the limits of insurance coverage in a claims-made policy. (*Gyler v. Mission*

---

[1]The parties call our attention to the fact that this provision is often designated a "discovery clause" in the insurance business.

*Ins. Co.* (1973) 10 Cal.3d 216, 220 [110 Cal.Rptr. 139, 514 P.2d 1219].) Though the coverage of a claims-made-and-reported policy is limited, the insuring agreement is still subject to the same principles of interpretation as other insurance policies. Two principles are relevant to the present case. We note, first, that the courts "'generally interpret the coverage clauses of insurance policies broadly, [in order to protect] the objectively reasonable expectations of the insured. . . .' [Citations.]" (*Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at p. 667; *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 808 [180 Cal.Rptr. 628, 640 P.2d 764].) Applying this principle to the reporting requirements under the policy, we think the transmission of pleadings in this case can serve as a means of reporting a claim; and if the pleadings contain material relevant both to the reporting of a claim and to circumstances covered by the awareness provision, they can serve the dual purpose of both reporting a claim and giving written notice of circumstances which may subsequently give rise to other claims. (*Harbor Ins. Co.* v. *Arthur Andersen & Co.* (1986) 149 Ill.App.3d 235 [102 Ill.Dec. 814, 500 N.E.2d 707, 711].)

Second, the covenant of good faith and fair dealing implied in all insurance agreements entails a duty to investigate properly submitted claims (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 817-819 [169 Cal.Rptr. 691, 620 P.2d 141]; *CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 610 [222 Cal.Rptr. 276] disapproved on other grounds in *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 297-298 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; *Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272, 278-279 [142 Cal.Rptr. 681]) and the insurer is charged with constructive notice of facts that it might have learned if it had pursued the requisite investigation. (*Span, Inc.* v. *Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463, 482 [277 Cal.Rptr. 828]; *California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 37 [221 Cal.Rptr. 171]; Civ. Code, § 19.) In *California Shoppers, Inc.* v. *Royal Globe Ins. Co., supra,* 175 Cal.App.3d 1, the insured sent the insurer a summons and complaint, without a cover letter, in an envelope bearing the name of another partially related company. The insurer denied the claim on the mistaken belief that it was submitted by the other related company. The court found that "the facts confronting the claims manager . . . were such as to put him on notice of the contractual duty to make a further inquiry. If he had made this further inquiry, he would have discovered that it was actually California Shoppers who had tendered the summons and complaint for defense . . . ." (*Id.* at p. 37.) The court held the insurer had constructive notice of the true identity of the insured because the claims manager would have ascertained this information if he had diligently carried out his contractual duty to make inquiries necessary for a proper handling of the claim. (*Id.* at p. 38.)

■ We consider that these principles have a clear application to a professional liability policy. Where the insured is held to a standard of ordinary skill and competence of members of a profession, the insurer may sometimes need the benefit of specialized knowledge to fairly evaluate its duty to defend and afford coverage. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 804, pp. 155-157.) The insured has reason to expect the insurer to employ an informed judgment in processing claims. In such cases, the covenant of good faith and fair dealing obliges the insurer to make inquiries regarding professional principles and practices. Similarly, the significance of written notice under the awareness provision should be evaluated in light of professional understanding of the matters disclosed rather than the potentially arbitrary suppositions of a layman. Under the principle of constructive notice, the insurer should be charged with the knowledge it would have gained by making necessary inquiries into the professional understanding of such written notice. (Civ. Code, § 19.)

■ We turn now to the facts of the present case. In considering California Union's duties under the awareness provision, we are concerned only with written notice that it received during the policy period of December 15, 1982, to December 15, 1983. The record reveals that it possessed two written sources of information: (1) the pleadings in the Moran action, and (2) the Knox letter dated September 26, 1983. The other documents dating back to the policy period merely reflect these two primary sources of information. The narrow issue is whether either of these sources of information constituted written notice of "circumstances which may subsequently give rise to" a claim for seismic deficiencies, which triggered coverage for the seismic claim later asserted in the Equitable action.

Although the issue is close, we do not think that the second amended complaint and third party complaint sufficed as written notice of a potential seismic claim. We note, first, that Moran sought damages of only $25,100 that it incurred as the general contractor in repairing certain cables (or tendons). The claim was predicated on an allegation that Moran incurred costs of this amount in "repairing and restoring the damage to the Hotel resulting from the tendon failures." The complaint did not allege, or seek damages for, structural deficiencies in the floor slabs, but only claimed reimbursement for a modest amount of work performed in repairing cable failures. Second, although both pleadings alluded to "cracking" of the floor slabs, the primary focus of the allegations, particularly in the third party complaint, was on cable failures which had in fact been repaired. The allegations provided minimal information from which one could assess the possibility, or extent, of remaining structural deficiencies in the building.

Appellants argue that, if construed in light of accepted engineering principles, the pleadings at least suggested the possibility of the sort of extensive

structural damage to the floor slabs, which would impair the lateral load-carrying capacity of the building. But we are concerned here with a narrow issue peculiar to a claims-made policy: the written notice necessary to trigger the expanded coverage afforded by the awareness provision.[2]

■ Our task is to determine the coverage "consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy." (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) ■ The parties bargained for a claims-made policy which has been described as essentially a "reporting" policy. (*Pacific Employers Ins. Co.* v. *Superior Court, supra*, 221 Cal.App.3d at p. 1358.) To this end, both the basic terms of the policy and the awareness provision define the triggering event as the reporting of claims made during the policy period.

By transmitting the Moran pleadings to the insurer, the insured did not explicitly invoke the awareness provision by providing notice of "circumstances which may subsequently give rise to" a separate seismic claim. More importantly, the pleadings did not provide information that was sufficient to serve one of the intended functions of the written notice required by the awareness provisions—the establishment of necessary reserves. While the pleadings contained allegations presenting a speculative possibility of seismic claims, they did not give the insurer a reasonable basis to infer the likelihood of such a claim. In short, since the pleadings were not intended as written notice under the awareness clause and did not effectively carry out the function of written notice called for by the provision, they cannot be regarded as providing the kind of written notice that constitutes an insuring event under the awareness provision.[3]

---

[2]The issue presented here—whether the insured gave the kind of written notice which qualifies as an insuring event under the awareness clause—is entirely distinct from the issue of an insurer's duty to defend under an occurrence policy. Hence, we see no relevance to the line of cases, stemming from *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276-277 [54 Cal.Rptr. 104, 419 P.2d 168], which hold that the insurer has a duty to defend whenever it "ascertains facts which give rise to the possibility or 'potential' of liability to indemnify . . . ." (*Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co., supra*, 76 Cal.App.3d at p. 278; *CNA Casualty of California* v. *Seaboard Surety Co., supra*, 176 Cal.App.3d at pp. 605-607.)

[3]Appellants argue that the trial court erred in admitting into evidence an application dated December 31, 1986, for insurance coverage from Security Insurance. They objected to the document on the ground of relevance and as evidence acquired subsequent to disclaimer of coverage. The trial court overruled the objection but admitted the application "only for the limited purpose of showing what KPFF knew in 1983." The ruling reflects a tenuous chain of inferences leading to a finding that was never seriously disputed: The application tends to prove KPFF was not aware of a seismic claim in 1986; it can therefore be inferred that it was not earlier aware of the claim during the policy period in 1983 and did not intend to give

Appellants point out that the only decision offering a close parallel to the present case reached a contrary conclusion. In *Harbor Ins. Co.* v. *Arthur Andersen & Co., supra,* 500 N.E.2d 707, an accounting firm was covered by a claims-made professional liability insurance policy with a provision essentially identical to the awareness provision at issue here. In 1971, the firm was sued for negligence in its auditing of transactions between King Resources Corporation and certain related entities, and it sent the insurer a copy of the complaint. In 1975, it was again sued by a mutual fund that claimed to be damaged by the improper reporting of sales between King Resources Corporation and affiliates. The court found that "in significant respects the dispute and evidence" in the 1975 lawsuit "arose out of the dispute" in the 1971 lawsuit. (*Id.* at p. 710.) Based on this finding, the court found "that notification of the complaint [in 1971] constituted sufficient notice of an occurrence which might give rise to subsequent claims" to come within the additional coverage provided by the awareness provision of the 1971 policy. (*Id.* at p. 711.)

We do not disagree with the *Harbor Insurance* decision, but we regard it as marking the outer limits of the coverage afforded by the awareness provision. The pleadings in the 1971 lawsuit effectively gave the insurer notice of circumstances giving rise to the 1975 lawsuit because both lawsuits concerned improprieties in accounting for the transactions between King Resources Corporation and its affiliates. As we have explained, the Moran pleadings at issue here were less informative; they suggested at best a possibility of other claims based on structural deficiencies of the floor slabs without providing enough information to allow the insurer to infer the likelihood of such claims.

Second, appellants rely on the information conveyed by the Knox letter dated September 26, 1983, as giving rise to coverage of the seismic claim under the awareness clause. The record now reveals that, during the policy period, Equitable learned of circumstances likely to give rise to the seismic claim when its engineering consultant, Neil Hawkins, reported extensive structural defects in the floor slab and urged an investigation of the building's lateral load-bearing capacity. Through Mr. Knox's letter, California Union received a vague, secondhand account of the Hawkins report.

The Knox letter, however, did not constitute written notice from the *insured* within the meaning of the awareness provision. Mr. Knox was

California Union notice of a seismic claim under the awareness clause. As we have seen, the record provides no basis to maintain that KPFF explicitly intended to give the requisite notice; the disputed question is whether the transmission of the Moran pleadings served the function of written notice of circumstances that might give rise to a seismic claim. Nevertheless, we see no error. Whether or not the document was admissible under Evidence Code section 210, appellants have not shown how they were prejudiced by its admission.

retained by the insurer to represent KPFF in the defense of the Moran action, but he possessed no broader authority to act on behalf of KPFF in insurance matters. The insurer's chance receipt of information from third parties does not constitute an insuring event under a claims-made policy; the insuring event consists rather of reports and notices provided by the insured. Thus, in *Campbell & Co. v. Utica Mut. Ins. Co.* (1991) 36 Ark.App. 143 [820 S.W.2d 284], the court held that, where the insured failed to submit a claim during the policy period, an insurer properly denied coverage under a claims-made policy, even though it received actual notice from a third party of a closely related claim. Also, Mr. Knox's letter set forth his subjective evaluation of the case based on his participation in the depositions and hearsay reports of Equitable's investigation. The letter did not indicate that any claim for seismic design deficiencies was or would be made. He was careful to point out that he could not say if "there is any substance to that report." Reports based upon speculation or rumor do not rise to the level of notice of a claim under the awareness provision.

■ Appellants argue that California Union was subject to a duty to investigate the structural problems mentioned in the Knox letter and therefore should be charged with constructive notice of the information that Equitable possessed. But the duty to investigate applies only to performance of contractual duties under the insurance policy since it is an aspect to the covenant of good faith and fair dealing. (*Egan v. Mutual of Omaha Ins. Co., supra*, 24 Cal.3d at p. 817.) An insurer thus has no duty to investigate matters which are not relevant to the performance of its contractual obligation to properly handle the insured's claim according to the terms of the policy. (See *California Shoppers, Inc. v. Royal Globe Ins. Co., supra*, 175 Cal.App.3d at p. 37.) As we have noted, the Moran claim—the only claim reported during the policy period—was not based on structural design deficiencies of the building but on expenses Moran had incurred as general contractor in repairing certain cable failures. To properly handle the Moran claim, the insurer had no need to investigate matters outside the scope of these repairs, and, accordingly, the report of cracks and sagging floors, which it received from Mr. Knox, did not entail a duty of further inquiry.

Furthermore, California Union was under no duty to investigate matters relating to coverage under the awareness provision until it received the written notice that the provision required. We have concluded that the Moran pleadings did not suffice as notice of a potential seismic claim under the awareness clause. Without having received the written notice which would trigger coverage under the awareness provision, the insurer had no duty to inquire on its own of circumstances that might give rise to a claim (cf. *Paulfrey v. Blue Chip Stamps* (1983) 150 Cal.App.3d 187, 199-200 [197

Cal.Rptr. 501] [no duty to investigate until insured complied with claims procedure]), and it cannot be charged with constructive notice of circumstances it had no duty to investigate.

The insurer's duty to investigate and the correlative concept of constructive notice unquestionably have a place in construing claims-made policies as well as other insurance policies; both concepts arise from the covenant of good faith and fair dealing implied in all insurance contracts. But appellants' interpretation of these concepts would transform the limited coverage, which the parties bargained for, into something much broader and more ill-defined. The insurer's duty of investigation under a claims-made policy should be confined to matters necessary for the proper handling of claims according to the terms of the policy.

We conclude that notice which would trigger coverage under the awareness provision for the seismic design defects alleged in the Equitable action was not provided to respondent during the policy period.

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed. Costs are awarded to respondent.

Strankman, P. J., and Dossee, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 22, 1997.

---

*See footnote, *ante*, page 963.